# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

DONALD K. FUNNELL )
 )
       Plaintiff, )
vs. ) NO. CIV-13-0034-HE
 )
STANDARD INSURANCE COMPANY, )
 )
       Defendant. )

## ORDER

Plaintiff Donald K. Funnell filed this action in state court seeking benefits under a group long-term disability plan (the "Plan") offered by his employer, Lytle, Soule and Curlee. The Plan, governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461, provided disability insurance under a policy issued by defendant Standard Insurance Company ("Standard"). Plaintiff claims defendant paid him long term disability benefits for two years and then arbitrarily and capriciously terminated them. He seeks to have the benefits reinstated and be awarded accrued benefits.

### Background

Plaintiff, who at some point in his life unknowingly contracted hepatitis C ("HCV"), was diagnosed in 2010 with end stage liver disease and placed on a transplant list. In August of that year he submitted a claim to defendant for long term disability benefits. Plaintiff provided two attending physicians statements ("APS") in support of his claim. One was completed on August 17, 2010, by Dr. Fowler, who had treated plaintiff since February 2009.

He listed (571.2) liver cirrhosis (alcoholic cirrhosis of liver) as his primary diagnosis,[1] (V02.6) Hep C infection as his secondary diagnosis, and alcohol abuse as another diagnosis related to the claim. AR 407. Dr. Fowler stated that plaintiff was "unable to work due to confusion, fatigue, and general debility secondary to his liver cirrhosis." AR 408. Dr. Elbeshbeshy completed two attending physician's statements. One dated August 18, 2010, and the second dated March 6, 2012. His primary diagnosis both times was (070.54) Hepatitis C or viral hepatitis. AR 402, 204. His secondary diagnosis in the 2012 statement was (571.5) liver cirrhosis or cirrhosis without mention of alcohol and he described plaintiff at that time as being "chronically very ill," with the planned treatment being to manage plaintiff's liver disease until he received a transplant. AR 204.

After receiving plaintiff's documentation, Standard asked independent physician George Spady, M.D. to review plaintiff's claim file. He examined records from Drs. Fowler, Elbeshbeshy, Hemric, and Grossman, records from Deaconess Hospital and the attending physician statements of Drs. Fowler and Elbeshbeshy. In his physician consultant memo dated October 24, 2010, Dr. Spady concluded plaintiff had "alcoholic liver disease on top of hepatitis C." AR 391. Plaintiff was precluded from working, Dr. Spady determined, because he "[had] alcoholic liver disease and was hospitalized with alcoholic liver disease with worsening ascites." *Id.* In his opinion, "[a]lcoholic liver disease is related to alcoholism"

---

[1]*Plaintiff points out the codes used by Dr. Elbeshbeshy in correspondence with Standard, but does not discuss the codes used by Dr. Fowler. AR 796. Diagnosis Code 571.2 refers to alcoholic cirrhosis of liver, while 070.54 refers to viral hepatitis.*

and alcoholism contributed to plaintiff's disability. AR 392.

On November 4, 2010, Standard notified plaintiff that it had approved his claim, but informed him that the policy's 24 month substance abuse limitation was applicable, so his benefits would end on June 22, 2012. Standard advised plaintiff that the policy definition of "substance abuse" included alcohol abuse and information in his claim file indicated that his disability was "caused or contributed to by alcohol and/or alcohol abuse." AR 844. Plaintiff was asked to send Standard any information he had that would negate application of the limitation as soon as possible.

In early January 2012, at Standard's request, Dr. Spady conducted an additional review to consider new records Standard had received that pertained to plaintiff's claim. In his supplemental assessment, Dr. Spady concluded that plaintiff had "alcoholic liver disease and hepatitis C on top of that." AR 328. Plaintiff's "alcoholism has," he stated, " played a significant role in his liver disease and is the main issue related to his liver problems." *Id.*

In April 2012, Standard wrote plaintiff and informed him his long term disability benefits would end effective June 22, 2012. Standard told plaintiff that a reviewing physician consultant had concluded that "alcoholism has played a significant role in your liver disease, is the main issue related to your continuing liver problems, and the primary reason over the past year for your inability to be accepted for a transplant." AR 799. Standard stated that, because information in plaintiff's claim file continued to demonstrate that his disability was "caused or contributed to by alcohol and/or alcohol abuse," it "[found] it reasonable and appropriate that [plaintiff's] LTD claim [be] subject to the 24 month

3

Substance Abuse Limitation." *Id.* Plaintiff was told that he had the right to seek review of the decision.

Plaintiff's attorney then wrote Standard, questioning Dr. Spady's objectivity and asking if he had reviewed Dr. Duffy's records when he prepared his January 2012 report.[2] He noted that plaintiff's physicians did "not diagnose 'alcoholic liver disease' anywhere." AR 752. In response, on May 10, 2012, Standard asked another independent physician, Bradly Fancher, MD, to review plaintiff's file. He essentially reached the same conclusion as Dr. Spady, that the claim file reasonably supported the conclusion that "the claimant's current medical condition and impairment over the past years has been substantially contributed to by his use of alcohol, alcoholism, and alcohol abuse." AR 234.

After plaintiff confirmed on May 17, 2012 that he wanted to appeal the claim decision, Standard forwarded plaintiff's file to the Administrative Review Unit ("ARU") for an independent review. Standard then deferred the appeal to allow plaintiff to provide additional material in support of his eligibility to receive LTD benefits after June 22, 2012. AR 747-48. When plaintiff had not provided any additional information or documentation by August 1, 2012, the ARU began its review based on materials then in plaintiff's file. AR. 743.[3] The review included obtaining the opinion of another independent physician, Dr.

---

[2]*Standard later informed plaintiff's counsel that it did not have medical records from Dr. Duffy at the time of Dr. Spady's review and that there was no reference to his treatment of plaintiff in prior correspondence or records plaintiff had provided. AR 750.*

[3]*In September plaintiff sent background information regarding Drs. Elbeshbeshy and Duffy, his current medication list and one page of an APS dated March 5, 2012, and signed by Dr. Elbeshbeshy.*

4

Beeson, M.D. Dr. Beeson looked at plaintiff's records and concluded that there was "absolutely no question whatsoever that the patient's history of alcohol abuse and continued alcohol use despite knowledge of cirrhosis and end-stage liver disease, at the very least contributed, if it did not cause his current disease process and his limitations." AR 223. On September 18, 2012, Stanford informed plaintiff that the ARU had completed its review and determined that "the decision to limit payment of [Plaintiff's] claim was correct and must be upheld." AR 710-15. Plaintiff then filed this action.

Standard of Review

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), sets forth the appropriate standard of review in cases contesting a benefit determination under an ERISA plan. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[4] *Id.* at 115. If the ERISA plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, [the court] review[s] the administrator's decision for an abuse of discretion." Murphy v. Deloitte & Touch Group Ins. Plan, 619 F.3d 1151, 1157 (10th Cir. 2010) (internal citations omitted). The court curtails its review "[u]nder the arbitrary and capricious standard, ... asking only whether the

---

[4]ERISA does not establish the standard of review. Firestone, 489 U.S. at 109.

5

interpretation of the plan 'was reasonable and made in good faith.'" [5] Weber v. GE Group Life Assur. Co., 541 F.3d 1002, 1010 (10th Cir. 2008) (quoting Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co., 491 F.3d 1180, 1189 (10th Cir.2007)). *See* Cardoza v. United of Omaha Life Ins. Co., 708 F.3d 1196, 1201-02 (10th Cir. 2013) ("Certain indicia of an arbitrary and capricious denial of benefits include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary.") (internal quotations omitted).

While neither party cites pertinent Plan language, they agree that a deferential standard of review should be applied.[6] However, plaintiff asserts because defendant is the decision-maker and the payor of benefits, a sliding scale approach should be used.

In Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008), the Supreme Court concluded that when "the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays

---

[5]*The Tenth Circuit "treat[s] the terms 'arbitrary and capricious' and 'abuse of discretion' as interchangeable in this context." Weber v. GE Group Life Assur. Co., 541 F.3d 1002, 1010 n.10 (10th Cir. 2008) (internal quotations omitted). Accord Foster v. PPG Indus., Inc., 693 F.3d 1226, 1231-32 (10th Cir. 2012).*

[6]*The policy language supports that conclusion. It states that "[w]e have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation and application of the Group Policy." AR 938. See Fleisher v. Standard Ins. Co., 679 F.3d 116, 121 (3d Cir. 2012) ("The Standard Policy vests the administrator with: '[F]ull and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve any questions arising in the administration, interpretation, and application of the Group Policy.' (A.79.) This language clearly triggers application of the deferential abuse of discretion standard of review. "); see also Foster, 693 F.3d at 1232.*

benefits out of its own pocket," a conflict of interest is created by the dual role. *Id.* at 108. While "the presence of a dual role conflict does not alter the level of deference accorded an administrator's decision," the court "must weigh the conflict 'as a factor in determining whether there is an abuse of discretion,' according it more or less weight depending on its seriousness." Murphy, 619 F.3d at 1157 n.1 (quoting Glenn, 554 U.S. at 115)). "[A] conflict of interest affects the outcome at the margin, when [the court] waver[s] between affirmance and reversal." Hancock v. Metropolitan Life Ins. Co., 590 F.3d 1141, 1155 (10th Cir. 2009). "A conflict is more important when 'circumstances suggest a higher likelihood that it affected the benefits decision,' but less so when the conflicted party 'has taken active steps to reduce potential bias and to promote accuracy.'" *Id.* (quoting Glenn, 554 U.S. at 117).

When reviewing a decision denying benefits, the court "'consider[s] only the rationale asserted by the plan administrator in the administrative record and determine[s] whether the decision, based on the asserted rationale, was arbitrary and capricious.'" Weber, 541 F.3d at 1011 (quoting Flinders, 491 F.3d at 1190). The review is based on the language of the plan. *Id.* The court considers "the plan documents as a whole and, if unambiguous, construe[s] them as a matter of law." *Id.* (internal quotation omitted). Words are given the common and ordinary meaning that "a reasonable person *in the position of the plan participant*, not the actual participant, would have understood the words to mean." *Id.* (internal quotations omitted). The court has confined its review to the administrative record, Flinders, 491 F.3d at 1190, *see* Foster v. PPG Indus., Inc., 693 F.3d 1226, 1231 (10th Cir. 2012) and begins its analysis by examining the policy language.

7

## The Plan

Defendant terminated plaintiff's benefits based on the policy's limitation of benefits for disabilities caused or contributed to by substance abuse. The pertinent policy provision states:

> A. Mental Disorders, Substance Abuse and Other Limited Conditions
>
> Payment of LTD Benefits is limited to 24 months during your entire lifetime for a Disability caused or contributed to by any one or more of the following, or medical or surgical treatment of one of more of the following:
>
> . . .
>
> 2. Substance Abuse.
>
> . . .
>
> Substance Abuse means use of alcohol, alcoholism, use of any drug, including hallucinogens, or drug addiction.

AR 935.

Plaintiff contends that defendant cannot demonstrate that substance abuse "caused" his disability, so the question becomes whether substance abuse "contributed to" it. He asserts that the court must not only construe "contribute to," as it is an undefined term, but, must construe it in his favor because it is ambiguous. Plaintiff argues that a reasonable person in the position of the insured would interpret the phrase to mean that his consumption of alcohol must have played a "significant part" in bringing about his disability for the limitation to apply. He claims [t]here is overwhelming evidence [his] liver disease was directly caused by chronic HCV," and that it is "only conjecture that alcohol had any

8

connection to [his] liver disease and disability." Doc. # 16, p. 13. The evidence falls short of demonstrating that his liver "was at all damaged by the consumption of alcohol," plaintiff asserts, thus making defendant's denial of benefits unwarranted. Doc. #16, p. 9.[7]

Analysis

The court must determine whether there is sufficient evidence in the administrative record to support defendant's assertion that plaintiff's alcohol use "caused or contributed to" his liver disease. The record does reflect that plaintiff denied using alcohol and challenges his daughter's statements to the contrary. However, evidence in the record pertaining to plaintiff's alcohol use is not, as he characterizes it, "anecdotal." On his APS, Dr. Fowler checked "yes" in response to the question of whether plaintiff's condition was primarily related to "Alcohol or Drug Condition." Ar. 407. Dr. Grossman diagnosed plaintiff with having "[a]lcoholism, hepatitis C, alcoholic cirrhosis" on his April 26, 2010, discharge summary, and noted that plaintiff's family had "intervene[d], and he was discharged straight to a rehab facility in another state." AR 542. When he was admitted the next day to a Jackson Mississippi hospital, the physician noted plaintiff has a "[s]ignificant alcohol history."[8] AR 699. A consulting physician who saw plaintiff on April 28, 2010, described

---

[7]*Citing AR 518-519, plaintiff also asserts in his brief that his physician examined his liver in 2009 and "not[ed] the liver was normal in all respects." Doc. #16, p. 2. However, Dr. Grossman noted that plaintiff had an abnormal liver function under "HISTORY OF PRESENT ILLNESS," which "abnormality was discovered years ago." AR 518. The doctor also wrote that plaintiff "has had abnormal LFTs [liver function tests] for many years. He is known Hepatitis C positive. Never treated." Id.*

[8]*That history was "obtained pretty much from [plaintiff's] two daughters," with some coming from Plaintiff. AR 699.*

9

his past medical history as including "hepatitis C, alcohol abuse with cirrhosis . . . alcoholic hepatitis and chronic pancreatitis," and his social history as including daily drinking of wine and vodka. AR 695.

In his June 9, 2010, consultation note, Dr. Elbeshbeshy described plaintiff's alcohol history as: "The patient started consuming alcohol at the age of 16, with history of heavy alcohol drinking, up to a six-pack of beer a day with two to three glasses of wine, and also would drink vodka on several occasions. He has history of passing out because of drug intoxication. His last alcoholic beverage was back in April 2010." AR 787.

Plaintiff's listing for a liver transplant was placed on hold "because of a positive urine toxicology screen" in August 2011.[9] AR 775. Dr. Elbeshbeshy's assessment was "[c]hronic hepatitis C genotype 4 with liver Cirrhosis and history of alcohol abuse.' AR 776 He noted that plaintiff's "last positive alcohol test was from June 2011," and he had a "[h]istory of noncompliance with urine toxicology screen." *Id.* At that time Plaintiff was attending 90 Alcoholics Anonymous meetings in 90 days as directed by his physician. AR 775-76.

Despite plaintiff's protestations to the contrary, ample evidence exists in the record for the physicians' findings that plaintiff has a "history of alcohol abuse." *Id.*[10] Ample

---

[9]*The doctor noted that, despite the positive test, Plaintiff "continues to adamantly deny consuming alcohol." AR 775.*

[10]*Plaintiff argues that what constitutes "abuse," should be the levels of alcohol consumption discussed in an article mentioned by "defendant's own hired doctor." Doc. #16, p. 8. However, the article does not state that alcohol has no effect on the liver unless consumed in the same amounts as the patients in the various studies. See AR, p. 247 ("Patients with severe liver disease were <u>more likely</u> to have past excessive alcohol consumption defined as . . . .") (emphasis added). Plaintiff refers to selected portions of the article. It also discusses studies in which the liver was impacted*

10

evidence also exists linking plaintiff's alcohol use to his liver disease.

Three independent medical consultants determined, based on plaintiff's medical records, that alcohol contributed to his impairment. Their conclusions were not, as plaintiff argues, based on "only conjecture that alcohol had any connection to [plaintiff's] liver disease and disability," Doc. #16, p. 13, as the following excerpt from Dr. Fancher's physician consultant memo demonstrates:

> Furthermore, the claimant had significant evidence of hepatitis due to alcohol. His initial transaminase levels revealed an AST of 192 and ALT of 57. As Dr. Grossman points out in the discharge summary [AR 541-42], this pattern is suggestive of alcoholic hepatitis and not hepatitis due to other factors. In alcoholic hepatitis the AST to ALT ratio is usually greater than 2. Furthermore, the claimant was found to have evidence of pancreatitis. The claimant's lipase on admission was 2772. Given that the claimant had already had a cholecystectomy it is quite evident that the claimant's pancreatitis was due to alcohol abuse. I would note that the development of alcoholic hepatitis as well as pancreatitis are both signs of severe alcohol abuse and toxicity.

AR 230-31. Dr. Fowler diagnosed plaintiff in August 2010, with "Hepatic encephalopahy, ETOH[11] HEP C. Cirrhosis." AR 407. A consulting physician in Mississippi in April 2010 assessed plaintiff as having "cirrhosis due to alcohol abuse and hepatitis C virus with complications . . . ." AR 696, and plaintiff's discharge summary from a Jackson Mississippi hospital on May 12, 2010, describes him as having a "significant past medical history of

---

*by lesser levels of consumption than 50 G or more per day and includes statements such as "[a] consistent observation has been that patients who are infected with hepatitis C and consume alcohol are at increased risk for progression to cirrhosis," AR 247 and "[t]he amount of alcohol required to increase the risk of disease progression in patients with HCV has not been well defined." AR 251.*

[11]ETOH refers to Ethanol alcohol or ethanol.

hepatitis C, alcoholic liver cirrhosis . . ." AR 683.

Admittedly there is uncertainty as to the exact extent to which plaintiff's alcohol use caused his impairment. As Dr. Fancher explained: "[S]ome physicians in the medical record have stressed the primary importance of the claimant's alcoholic liver disease with regard to the development of cirrhosis, and other physicians have stressed the claimant's hepatitis C. As I have explained above, it is impossible to separate these two factors. They work synergistically." AR. 233. There is no uncertainty, though, that plaintiff's use of alcohol contributed to his disability, regardless of how "contribute" is defined.[12]

Standard did not offer a definition of the term. Regardless, the court concludes Standard did not abuse its discretion in applying the substance abuse limitation to plaintiff's claim,[13] even if plaintiff's definition of "play a significant part" or "to act as a determining factor'"[14] is used.

While Standard was operating under a conflict of interest, it took "'active steps to reduce potential bias and to promote accuracy.'" Foster, 693 F.3d at 1232 (quoting Glenn, 554 U.S. at 117). It had three independent physicians review plaintiff's claim file, gave him several chances to supplement the information he had provided, and conducted an

---

[12]*As the policy limitation applies if the substance abuse "caused or contributed to" the disability, and there is sufficient evidence to support the conclusion that plaintiff's alcohol use "contributed to" his liver disease, the court does not have to determine if it also "caused" it.*

[13]*Plaintiff also claims that the term abuse is not defined and therefore must be interpreted in his favor. The court does not find the term to be ambiguous.*

[14]*Webster's II New Riverside University Dictionary 306 (1988).*

independent review. Here, as in Foster, "[t]he circumstances do not suggest a 'higher likelihood' that the inherent conflict 'affected the benefits decision.'" *Id. See* Cardoza, 708 F.3d at 1202-03.

Even if Standard's inherent conflict of interest was given more than minimal weight in the analysis, the court still would conclude that the insurer's decision was not arbitrary or capricious. Substantial evidence, discussed previously, supports it. *See* Cardoza, 708 F.3d at 1202 ("Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker. Substantial evidence requires more than a scintilla but less than a preponderance.") (internal quotations omitted). The court recognizes that the record includes evidence which attributes plaintiff's "end-stage liver disease" to hepatitis C, such as in the consultation note of Dr. Duffy, who evaluated plaintiff for a liver transplant.[15] However, unanimity of opinion is not required to sustain a plan administrator's determination. Standard's decision that the substance abuse limitation applied to plaintiff's long term disability claim was reasonable and supported by substantial evidence. *See* Fleisher, 679 F.3d at 126 ("Moreover, the relevant inquiry is whether Standard's interpretation is supported by 'substantial evidence,' which does not require that the evidence uniformly supports its conclusion, but merely requires such relevant evidence

---

[15]*Plaintiff asserts it was "the consensus of [his] treating physicians that his disability was due to HCV," citing to the statements of Drs. Duffy and Elbeshbeshy. Doc. #16, p. 3. However, in his April 27, 2011, progress note, Dr. Elbeshbeshy wrote under "HISTORY OF PRESENT ILLNESS," that plaintiff had come in for a followup for his blood work and "[h]e continues to follow up for his liver disease secondary to liver cirrhosis secondary to alcohol abuse and hepatitis C . . ." AR 356.*

as a reasonable mind might accept as adequate to support a conclusion.") (internal quotations omitted). The decision was neither an unreasonable interpretation or application of the policy.

Accordingly, the court affirms Standard's application of the substance abuse limitation to plaintiff's benefits claim.

**IT IS SO ORDERED**.

Dated this 20th day of November, 2013.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE